# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 18, 2023       Decided March 29, 2024

No. 22-1233

SIERRA CLUB,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

EMPIRE PIPELINE, INC. AND NATIONAL FUEL GAS SUPPLY
CORPORATION,
INTERVENORS

———

On Petition for Review of an Order
of the Federal Energy Regulatory Commission

———

*Nathan Matthews* argued the cause for petitioner. With him on the briefs was *Ankit Jain,* at the time the brief was filed. *Thomas Gosselin* entered an appearance.

*Susanna Y. Chu*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Eamon P. Joyce* argued the cause for respondent-intervenors. With him on the brief was *Brooke E. Boyd. Emily P. Mallen* entered an appearance.

*Michael Diamond* and *Michael R. Pincus* were on the brief for *amicus curiae* Interstate Natural Gas Association of America in support of respondent.

————

No. 22-1235

SIERRA CLUB AND PUBLIC CITIZEN,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CHENIERE CORPUS CHRISTI PIPELINE, L.P. AND CORPUS
CHRISTI LIQUEFACTION, LLC,
INTERVENORS

————

Consolidated with 22-1267

————

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

————

*Nathan Matthews* argued the cause for petitioners. With him on the briefs was *Thomas Gosselin*.

*Matthew J. Glover*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor. *Susanna Y. Chu*, Attorney, entered an appearance.

*Catherine E. Stetson* argued the cause for respondent-intervenors. With her on the brief were *Sean Marotta* and *Michael West*.

Before: HENDERSON and PAN, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PAN.

PAN, *Circuit Judge*: When the Federal Energy Regulatory Commission ("FERC" or the "Commission") approves the construction of natural-gas infrastructure, such as a pipeline, it sets a deadline for the completion of the construction project. If the project developer requests an extension of that deadline, FERC generally will grant the request if the developer (i) shows "good cause" for needing the extension, in a motion made before the deadline expires, 18 C.F.R. § 385.2008(a), and (ii) acts "within a timeframe during which the environmental and other public interest findings underlying the [project approval] can be expected to remain valid," *Algonquin Gas Transmission, LLC*, 170 FERC ¶ 61,144, at P 15 (2020). FERC applied those principles to grant extensions of time for two developers to complete pipeline projects. Sierra Club petitions for review of the extension decisions, joined by Public Citizen in one of the cases. Both petitions essentially contend that FERC was too permissive in finding "good cause" to grant the

extensions. Because FERC acted well within its discretion in both cases, we deny the petitions for review.

## I.

### A.

Under the Natural Gas Act ("NGA"), 15 U.S.C. § 717 *et seq.*, FERC regulates the interstate transportation and sale of natural gas. A developer who wishes to construct facilities that are used to transport or sell natural gas must seek authorization from FERC by applying for a certificate of public convenience and necessity. 15 U.S.C. § 717f(c)–(d). FERC will issue a certificate to authorize the project if it finds that (1) the applicant is "able and willing properly to do the acts and to perform the service proposed," in conformance with the NGA and FERC's "requirements, rules, and regulations"; and (2) the proposed project "is or will be required by the present or future public convenience and necessity." *Id.* § 717f(e). Prior to authorizing a natural-gas infrastructure project, FERC undertakes an extensive analysis of market need, the public interest, and any environmental effects of the proposed project. *Id.*; *Sierra Club v. FERC*, 867 F.3d 1357, 1373 (D.C. Cir. 2017) ("FERC will balance the public benefits against the adverse effects of the project, including adverse environmental effects." (cleaned up)). As part of the certification process, FERC "set[s] the matter for hearing and . . . give[s] such reasonable notice of the hearing . . . to all interested persons." 15 U.S.C. § 717f(c)(1)(B).

Any person may file comments about whether a natural-gas infrastructure project should be approved. 18 C.F.R. § 385.211; 18 C.F.R. § 157.10. Commenters can also intervene and become parties to the proceeding before FERC. 15 U.S.C. § 717n(e) ("[T]he Commission . . . may admit as a party . . . any other person whose participation in the proceeding may be

in the public interest."); 18 C.F.R. § 385.214 (FERC procedures for intervention). FERC considers comments about project approval and responds to them substantively in the order granting the authorization certificate. *See Algonquin Gas*, 170 FERC ¶ 61,144, at P 40. The project is also examined under the National Environmental Policy Act ("NEPA"), through the issuance of either an environmental assessment or an environmental impact statement. *See* 42 U.S.C. § 4321 *et seq.*

The NGA does not require FERC to set deadlines for the completion of construction projects. But FERC has authority to "perform any and all acts" to "prescribe, issue, make, amend, [or] rescind" a certificate order, "as [the agency] may find necessary or appropriate to carry out the [NGA]." 15 U.S.C. § 717o. Under a FERC regulation, "[a]ny authorized construction [or] extension . . . shall be completed and made available for service . . . within [a] period of time to be specified by the Commission in each order." 18 C.F.R. § 157.20(b) (cleaned up). Such project deadlines, set by FERC, are premised on "a reasonable period of time for the project sponsor to complete construction." Order Granting Request for Extension of Time, *Nat'l Fuel Gas Supply Corp.* (*Nat'l Fuel Extension Order*), 179 FERC ¶ 61,226, at P 10 (2022). FERC has explained in prior orders why setting deadlines serves important interests. First, having a deadline for completion protects "the information supporting [FERC's] public convenience and necessity determinations . . . [from] go[ing] [stale] with the passage of time." *PennEast Pipeline Co., LLC*, 170 FERC ¶ 61,138, at P 16 (2020). Second, deadlines provide certainty to neighboring landowners, ensuring that they are not indefinitely constrained from "pursuing activities that could prove incompatible with the project's construction or operation." *Chestnut Ridge Storage LLC*, 139 FERC ¶ 61,149, at P 10 (2012). Finally, construction deadlines prevent

developers from holding on to certificates for so long that they "inhibit a potential competitor from pursuing its own project to serve the same market." *Id*. at P 9.

Another regulation, 18 C.F.R. § 385.2008(a), provides that FERC may grant extensions of time for project completion "for good cause, upon a motion made before" the operative deadline. "Good cause" is the only showing that a certificate holder is required to make if the extension request is filed "within a timeframe during which the environmental and other public interest findings underlying the Commission's authorization [of the project] can be expected to remain valid." *Algonquin Gas*, 170 FERC ¶ 61,144, at P 15 (2020). An extension of time is an amendment of the project-completion deadline in the certificate order, under section 717o of the NGA. *See* 15 U.S.C. § 717o (empowering FERC to perform "any and all acts" to amend a certificate order, as "necessary or appropriate").

When a developer applies for an extension, FERC publishes the application so that any person can provide comments about whether the extension should be granted. *See Algonquin Gas*, 170 FERC ¶ 61,144, at P 39.[1] If FERC issues an extension order, persons that opposed the extension can submit a request for rehearing. *See* 15 U.S.C. § 717r(a) (noting that a party "aggrieved by an order issued by the Commission in a proceeding . . . may apply for rehearing within thirty days

---

[1] In *Algonquin Gas*, FERC "acknowledg[ed] the importance of public involvement and transparency in its decision-making processes," and "directed the Office of the Secretary and Office of Energy Projects to: (1) notice all requests for extensions of time to complete construction for Natural Gas Act facilities within 7 calendar days of receiving the request and (2) establish a 15-calendar day intervention and comment period deadline." *Nat'l Fuel Extension Order*, 179 FERC ¶ 61,226, at P 9.

after the issuance of such order"). FERC can deny rehearing either by operation of law, when it declines to act on the rehearing request within thirty days, or by issuing an order explaining its rationale for the denial. *Id*.; 18 C.F.R. § 385.713(f). After parties to a proceeding exhaust their arguments before the Commission by seeking rehearing, they may petition for review of FERC's decision in this court. 15 U.S.C. § 717r(b) ("No objection . . . shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do."). We have jurisdiction over a timely petition for review under 15 U.S.C. § 717r(b).

**B.**

National Fuel Gas Supply Corporation ("National Fuel") seeks to build the 99-mile Northern Access Pipeline across Pennsylvania and New York. The proposed pipeline will connect gas producers to markets in Canada and throughout the northeastern United States. FERC first approved the pipeline project in a 2017 Certificate Order, requiring it to be completed by February 3, 2019. *Nat'l Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145 (2017), *on reh'g*, 164 FERC ¶ 61,084 (2018). But National Fuel ran into a major hurdle: The New York State Department of Environmental Conservation ("NYSDEC") denied its application for a water-quality certification under section 401 of the Clean Water Act ("CWA"). National Fuel challenged that decision, spawning years of litigation in the Second Circuit. As a result of the ongoing litigation, FERC granted National Fuel an extension of time in 2019, pushing the deadline for project completion back to February 3, 2022. The 2019 extension is not at issue in this case.

In 2021, National Fuel prevailed in the Second Circuit litigation. National Fuel's period of legal uncertainty ended

when NYSDEC's time to petition the Supreme Court for a writ of certiorari expired. Five months later, National Fuel filed with FERC a request for another extension of time to complete the project. In support of its request, National Fuel stated that it needed additional time to "refresh" certain environmental permits after the end of the Second Circuit litigation. Nat'l Fuel J.A. 29, 31.

Sierra Club moved to intervene and submitted a protest opposing the extension. Sierra Club's protest noted that National Fuel's request for an extension "offers no explanation" as to "[w]hat permits it is referring to" and "[w]hat steps remain to be taken for these permits." Nat'l Fuel J.A. 64–65 (emphasis omitted). FERC responded to the protest by sending National Fuel a request for additional information about the environmental permits that it needed to update. National Fuel promptly submitted a chart that clarified the status of each of its environmental permits under the CWA and the Endangered Species Act. FERC then issued an Extension Order granting National Fuel a 35-month extension of its deadline, until December 31, 2024. FERC determined that there was "[g]ood cause" for the extension because "[t]he Commission has previously found that providing more time for a project applicant to obtain necessary permits can be an appropriate basis for granting an extension of time." *Nat'l Fuel Extension Order*, 179 FERC ¶ 61,226, at P 15.

Sierra Club filed a request for rehearing, contesting FERC's finding of good cause for the extension. Sierra Club claimed that National Fuel had not diligently pursued the project because National Fuel did not actively procure necessary permits. Sierra Club also argued that FERC failed to appropriately consider whether the original Certificate Order's findings remained valid and failed to supplement its NEPA analysis based on new circumstances. As part of its NEPA

argument, Sierra Club asserted that FERC had failed to address the impact of a new statute, the 2019 New York Climate Leadership and Community Protection Act ("Climate Act"), on project need. FERC issued a notice of denial of rehearing by operation of law. Sierra Club timely petitioned for review of the Commission's Extension Order. *See* 15 U.S.C. § 717r(b).

## C.

Corpus Christi Liquefaction Stage III, LLC, Corpus Christi Liquefaction, LLC, and Cheniere Corpus Christi Pipeline, LP (collectively, "Cheniere") sought FERC's approval to build a series of improvements to an existing liquefied natural gas ("LNG") terminal on Texas's Corpus Christi Bay and a related pipeline. *Corpus Christi Liquefaction Stage III, LLC*, 169 FERC ¶ 61,135, at P 1–2 (2019). FERC granted its approval in a 2019 Authorization Order, which included a certificate of public convenience and necessity. The Authorization Order required the project to be completed by November 22, 2024.

In 2021, Cheniere filed a request to extend the deadline for its project by 31 months, until June 30, 2027. Cheniere cited the COVID-19 pandemic as the reason for its delay — specifically, it stated that the "onset and duration of the COVID-19 pandemic resulted in adverse economic and logistical conditions that slowed commercial progress and precluded [Cheniere] from making a timely Final Investment Decision ('FID') on the [project]." Cheniere J.A. 26. Sierra Club and Public Citizen filed motions to intervene and filed a protest opposing the extension and contesting good cause.

FERC granted Cheniere's extension request. The Extension Order found that Cheniere had established good cause for an extension because "[t]he unforeseeable impacts of the COVID-19 pandemic combined with the companies'

continued interest in the project satisfy the Commission's good cause inquiry." Order Granting Extension of Time Request, *Corpus Christi Liquefaction Stage III, LLC* (*Cheniere Extension Order*), 179 FERC ¶ 61,087, at P 13 (2022). Sierra Club and Public Citizen submitted a request for rehearing of the Extension Order, which FERC denied by operation of law. *See* 15 U.S.C. § 717r(a). Sierra Club and Public Citizen timely filed a petition for review of the Extension Order. *See* 15 U.S.C. § 717r(b).

Thereafter, FERC issued an Order on Rehearing. The Rehearing Order provided further explanation of FERC's decision to grant the extension by elaborating on the public-interest findings and addressing certain NEPA arguments. With respect to good cause, the Rehearing Order stated: "[I]n the Extension Order, the Commission adequately addressed the [Petitioners'] arguments regarding the Commission's conclusion that the companies demonstrated good cause for delay." Order on Rehearing, *Corpus Christi Liquefaction Stage III, LLC*, 181 FERC ¶ 61,033, at P 9 (2022). Sierra Club and Public Citizen filed a timely petition for review of the Rehearing Order. We consolidated the appeals of Cheniere's Extension Order (No. 22-1235) and Rehearing Order (No. 22-1267).[2]

## II.

FERC's authority to set and extend construction deadlines is rooted in its broad power to "perform any and all acts" to "prescribe, issue, make, amend, [or] rescind" a construction-

---

[2] Petitioners ask us to clarify if a separate filing was necessary or if the first petition for review would have sufficed to confer jurisdiction to review the Rehearing Order as well, as it modifies the Extension Order. We decline to resolve that question because it has not been briefed.

authorization certificate — a power that may be exercised whenever the Commission deems it "necessary or appropriate to carry out the [NGA]." 15 U.S.C. § 717o; *see also Tenn. Gas Pipeline Co., v. FERC*, 860 F.2d 446, 452 (D.C. Cir. 1988) (FERC "has broad discretion in exercising its authority under the [NGA]" pursuant to § 717o.); *Panhandle E. Pipe Line Co. v. FERC*, 907 F.2d 185, 189 (FERC can "exercise . . . its general equitable powers" under § 717o.). Moreover, FERC is "entitled to substantial deference" in an area involving "a judgment . . . [of] regulatory policy at the core of FERC's mission." *Sacramento Mun. Util. Dist. v. FERC,* 616 F.3d 520, 533 (D.C. Cir. 2010).

FERC's discretion in granting an extension of time for a natural-gas construction project is limited only by the arbitrary-and-capricious standard of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706(2)(A) (A court will set aside agency action when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); *La. Pub. Serv. Comm'n v. FERC*, 866 F.3d 426, 429 (D.C. Cir. 2017). In reviewing FERC's extension orders, we do not ask "whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016). Instead, we must uphold such a decision if the Commission has "examine[d] the relevant [considerations] and articulate[d] a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (cleaned up).

## III.

Both National Fuel and Cheniere filed timely applications for extensions of time to complete their construction projects,

and FERC found "good cause" to grant their requests. *See* 18 C.F.R. § 385.2008(a) (FERC may grant extensions of time for project completion "for good cause, upon a motion made before" the prior deadline.). In both cases, FERC had previously conducted lengthy review processes before approving the projects in the first place; and, in considering the requests for extensions, FERC found that the project sponsors had demonstrated diligence in the continued pursuit of their projects. With respect to National Fuel, FERC also determined that delays caused by litigation constituted good cause to grant an extension. For Cheniere, the Commission found that the COVID-19 pandemic caused logistical problems that amounted to good cause. We hold that FERC reasonably granted each company an extension of time and adequately explained its decisions. Thus, the Commission's actions were neither arbitrary nor capricious.

**A.**

FERC generally grants a timely application for an extension of a construction deadline if a project sponsor demonstrates "good cause" for its request, 18 C.F.R. § 385.2008(a), and files its application "within a timeframe during which the environmental and other public interest findings underlying the Commission's authorization can be expected to remain valid," *Algonquin Gas*, 170 FERC ¶ 61,144, at P 15. FERC has permissibly adopted a case-by-case, fact-based approach to deciding whether an extension of time is warranted. *See, e.g., Adelphia Gateway, LLC*, 178 FERC ¶ 61,030, at P 15 (2022). In both cases on review, FERC noted, as it has in many similar cases, that "'[g]ood cause' can be shown by a project sponsor demonstrating that it made good faith efforts to meet its deadline but encountered circumstances beyond its control." *Nat'l Fuel Extension Order*, 179 FERC

¶ 61,226, at P 10 (2022); *accord Cheniere Extension Order*, 179 FERC ¶ 61,087, at P 8.[3]

FERC's reasoning in each of the instant cases is consistent with the Commission's previous determinations of how good cause "can be shown." *E.g.*, *Cheniere Extension Order*, 179 FERC ¶ 61,087, at P 8; *Delfin LNC LLC*, 178 FERC ¶ 61,031, at P 10 (2022). For example, the Commission has found that sponsors made good-faith efforts where they advanced their projects by applying for permits, engaging in litigation, acquiring necessary land rights, or negotiating with state agencies. *See*, *e.g.*, *Arlington Storage Co.*, 155 FERC ¶ 61,165, at PP 11–13 (noting that Arlington had all necessary property rights and was continuing to work with a New York state agency); *Algonquin Gas*, 170 FERC ¶ 61,144, at PP 26–29 (citing Algonquin's filing of lawsuits challenging zoning and wetlands ordinances). Moreover, in examining reasons for delay, FERC has found a wide range of circumstances to support good cause, including legal or litigation-related barriers, as well as impacts from the COVID-19 pandemic. *See, e.g.*, *Algonquin Gas*, 170 FERC ¶ 61,144, at P 34 (delay

---

[3] We observe that, in some cases, FERC has used the same wording as that employed in the National Fuel Extension Order. *See Adelphia Gateway, LLC*, 178 FERC ¶ 61,030, at P 15. In other cases, FERC's articulation of the standard has varied by just a few words. *See Cheniere Extension Order*, 179 FERC ¶ 61,087, at P 8 ("encountered circumstances *that prevented it from doing so*") (emphasis added); *Algonquin Gas*, 170 FERC ¶ 61,144 at P 32 ("encountered unforeseeable circumstances"); *Const. Pipeline Co.*, 169 FERC ¶ 61,102, at P 19 (2019) (same); *Const. Pipeline Co.*, 165 FERC ¶ 61,081, at P 9 (2018) (same); *Chestnut Ridge*, 139 FERC ¶ 61,149, at P 11 ("good faith efforts to meet a deadline have been thwarted by unforeseeable circumstances"); *Columbia Gas Transmission, LLC*, 172 FERC ¶ 61,162, at P 8 (2020) ("good faith efforts to meet a deadline have been thwarted" (cleaned up)).

caused by lawsuit); *Mountain Valley Pipeline, LLC,* 173 FERC ¶ 61,026, at P 12 (2020) (delay caused by legal challenges affecting permits from five different federal agencies); *Adelphia Gateway*, 178 FERC ¶ 61,030, at PP 19–20 (delay caused by COVID-19's disruption of state agencies, construction activities, and material procurement).  In sum, in the cases on review, the Commission followed its reasonable practice of evaluating the project sponsor's diligence and the reasons for delay in determining whether the extension requests were supported by "good cause."

Petitioners argue that FERC's "good cause" inquiry is too lax, asserting that the agency essentially rubber-stamps all requests for extensions of time.  *See* Oral Argument at 18:15, *Sierra Club v. FERC* (No. 22-1235) (noting that FERC almost never "says no" to extension requests).  Although it is true that FERC has denied very few extension requests, that is not surprising.[4]   Project sponsors invest significant time and resources to secure approval of their pipelines and related facilities, and they generally have economic incentives to promptly complete construction.   Accordingly, sponsors typically can meet the "good cause" standard by demonstrating their diligence and citing factors beyond their control that have slowed their progress.  *See, e.g.*, *Algonquin Gas,* 170 FERC ¶ 61,144, at P 34; *Mountain Valley Pipeline,* 173 FERC ¶ 61,026, at P 12.  Project developers who intend to abandon a

---

[4]    FERC has cited only three examples in the last three decades where it denied an extension request.  *Chestnut Ridge*, 139 FERC ¶ 61,149 (2012); *Leaf River Energy Ctr. LLC*, 156 FERC ¶ 61,015 (2016); *Questar Pipeline Co*., 65 FERC ¶ 61,037 (1993).  But the Commission occasionally grants an extension of time for a shorter period than the sponsor requested.  *Northwest Pipeline LLC*, 171 FERC ¶ 61,077, at P 3 (2020); *Delfin LNG LLC*, 178 FERC ¶ 61,031, at P 3.

project likely would not request any extension. *See Wyoming-California Pipeline Co.*, 70 FERC ¶ 61,041, 61,130 (1995) (rescinding a certificate because a developer still had not applied for an extension with only a month left before the deadline). Thus, the percentage of extensions granted is not necessarily evidence that the Commission's decision-making process is faulty. To the contrary, the standard adopted by FERC is reasonable and falls well within the Commission's broad discretion to "amend" a certificate order as "necessary or appropriate." 15 U.S.C. § 717o.

**B.**

The foregoing framework for determining "good cause" to extend a construction deadline assumes that the facts and determinations underlying the original certificate approval have not changed. Where there has been no significant shift in the relevant circumstances, FERC generally declines to reevaluate issues that already were addressed when the agency first approved the project. *See, e.g., Algonquin Gas*, 170 FERC ¶ 61,144, at P 40 ("The Commission will not consider arguments that re-litigate the issuance of the certificate order, including whether the Commission properly found the project to be in the public convenience and necessity and . . . the Commission's environmental analysis."). This forward-looking policy promotes the interests of FERC and project developers in finality: It allows FERC to avoid duplicating the extensive work that was done when granting the certificate; and allows developers to rely on their certificates as they construct their facilities. *See id.* Thus, as a general matter, FERC prohibits commenters from opposing an extension of time by challenging the findings and reasoning underlying the certificate order, but instead requires them to present new information or circumstances that post-date the certification process. *See id.* at P 15 ("At the time a pipeline requests an

extension of time, orders on certificates of public convenience and necessity are final.").

FERC has leeway, however, to revisit prior market-need or environmental findings when new circumstances render such findings stale or out of date. *See Algonquin Gas,* 170 FERC ¶ 61,144, at P 15 (noting that the good cause standard applies only "within a timeframe during which the environmental and other public interest findings underlying the Commission's authorization can be expected to remain valid"). In such circumstances, FERC may account for the changed conditions by relying on its discretion to "amend" a certificate order as "necessary or appropriate." 15 U.S.C. § 717o. We are not aware of any instance where FERC decided to deny an extension request — and effectively cancel the Commission's approval of a project — solely based on a finding that circumstances had changed.

Sierra Club argues that § 717o requires FERC to re-evaluate the findings underlying the original certificate order any time that it considers an extension request to ensure that its decision is "appropriate." We disagree. Section 717o is a broad grant of authority to FERC. It empowers FERC to take whatever actions "it may find necessary or appropriate" to amend a certificate of public convenience and necessity. *Id.* The plain language of the statute allows FERC to determine, in its discretion, what is "appropriate" to be considered.

Nevertheless, FERC must sometimes account for substantial or significant changes that impact a project's approval when fulfilling the Commission's independent obligation to comply with NEPA. 40 C.F.R. § 1502.9(d)(1). Specifically, the Commission must prepare a supplemental environmental analysis if (1) "a major Federal action remains to occur," and (2) "[t]he agency makes substantial changes to

the proposed action that are relevant to environmental concerns" or "[t]here are significant new circumstances or information relevant to environmental concerns." *Id*.

In sum, the NGA, NEPA, and the Commission's prior precedents all provide bases for FERC to revisit its prior findings due to a significant change in circumstances. The Commission revisits its prior findings if it believes doing so is "necessary or appropriate" under the NGA or is mandated by NEPA; and it has substantial discretion to amend an approval certificate on those grounds. 15 U.S.C. § 717o; 40 C.F.R. § 1502.9(d)(1). A determination by FERC about whether changed circumstances have undermined the validity of its previous findings of public convenience and necessity is entitled to substantial deference because such a decision necessarily relies on the Commission's technical expertise. *See Sacramento Mun. Util. Dist*., 616 F.3d at 533 (noting that "technical inquir[ies] [are] properly confided to FERC's judgment"). Such deference also is due to a FERC determination about whether a supplemental environmental analysis is necessary under NEPA because such a judgment relies on the Commission's evaluation of "substantial changes" to the proposed project or "significant new circumstances or information" related to the project. *See* 40 C.F.R. § 1502.9(d)(1); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989) (requiring courts to "defer to the informed discretion of the responsible federal agencies" in whether to prepare a supplemental environmental impact statement (cleaned up)); *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004) ("[FERC's] determination that the new information was not significant enough to warrant preparation of a supplement to the [environmental analysis] is entitled to deference.").

18

**C.**

Applying the foregoing principles, we conclude that FERC adequately explained its rationale for finding good cause to grant National Fuel's request for an extension of its project deadline. FERC cited its long-standing practice of granting extensions to "provid[e] more time for a project applicant to obtain necessary permits." *Nat'l Fuel Extension Order*, 179 FERC ¶ 61,226, at P 15. The Commission recognized that the Second Circuit litigation was "part of [National Fuel's] efforts to obtain a state authorization," which demonstrated National Fuel's "continued interest in the project." *Id*. FERC also noted that the litigation was a significant obstacle to the project's advancement that was beyond National Fuel's control. *Id*. at P 5. FERC's application of its "good cause" standard to National Fuel's circumstances was well "within the bounds of reasoned decisionmaking." *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105 (1983).

Sierra Club errs in arguing that "good faith" invariably requires a project sponsor to actively pursue all needed permits. Because National Fuel did not pursue certain permits between August 2021 and January 2022, Sierra Club asserts that FERC must explain why it nevertheless found good cause to grant the extension. Sierra Club's proposed interpretation of "good faith" is unduly exacting. While continuously and actively pursuing permits may suffice to show good faith, such persistence is not always *necessary* to meet that standard. FERC may decide, in its discretion, that other types of reasonable efforts, other than "active pursuit" of all permits, are sufficient. *See*, *e.g.*, *Algonquin Gas*, 170 FERC ¶ 61,144, at PP 34, 36 (responding to an allegation of undue delay by stating "[t]he record before us reflects no bad faith or delay on the company's part, but rather what appears to be reasonable efforts to move the project forward"). Here, FERC permissibly

relied on National Fuel's litigation of the CWA issue in the Second Circuit as evidence of National Fuel's good-faith pursuit of the project. That decision was not arbitrary or capricious.

Sierra Club further argues that circumstances have changed, and that FERC should have denied the extension request because the Northern Access Pipeline is no longer needed. According to Sierra Club, under the NGA and NEPA, FERC was required to reconsider its findings of market need because New York passed the 2019 Climate Act, which requires the state to reduce its natural-gas usage. Sierra Club cites analysis predicting that "end-use gas demand [will] decline[] significantly [in New York], with reductions ranging from 83–95% by 2050." Nat'l Fuel J.A. 54 n.16. Thus, according to Sierra Club, FERC must reconsider whether the Northern Access Pipeline still serves new demand for gas and whether construction of the pipeline remains in the public interest.

As an initial matter, Sierra Club's argument about the Climate Act was exhausted before the Commission and is properly before us. Sierra Club made statements in its rehearing petition that were sufficient to put FERC on notice of its market-need argument. *See Ameren Servs. Co. v. FERC*, 893 F.3d 786, 793 (D.C. Cir. 2018) (to be exhausted, arguments must be laid out with sufficient detail to "alert[] the Commission to the specific legal argument[]" being presented (cleaned up)). In its rehearing request, Sierra Club wrote that New York's Climate Act "requires a statewide transition away from the use of natural gas to produce electricity," which "likely undercuts or reduces demand for gas in New York, and thus in the market purportedly served by the pipeline." Nat'l Fuel J.A. 154. That argument gave FERC notice of the legal issues that Sierra Club intended to pursue.

Sierra Club contends that FERC's failure to consider the effects of the Climate Act renders the Extension Order arbitrary and capricious. But we defer to FERC's determination that circumstances did not change substantially enough to revisit its underlying findings. *See Sacramento Mun. Util. Dist.*, 616 F.3d at 533 (requiring deference to "technical inquir[ies] properly confided to FERC's judgment"). Contrary to Sierra Club's contentions, FERC's decision not to revisit its market-need finding was reasonable and supported by the record evidence: The record demonstrates that the Climate Act will have little effect on the demand for the natural gas transported by National Fuel's pipeline. First, the project remains fully subscribed, pursuant to the same precedent agreement that was evaluated in the 2017 Certificate Order.[5] Second, the pipeline does not primarily serve New York — it is focused on channeling gas into Canada and throughout the northeastern United States. While the record reflects that some of the gas could be diverted to upstate New York, that relatively insubstantial amount does not undermine FERC's determination that the pipeline's overall market-need finding remains valid, especially under our deferential standard of review. *See Nat'l Fuel Gas Supply Corp.*, 158 FERC ¶ 61,145,

---

[5]  Sierra Club makes some arguments attacking the fact that National Fuel's precedent agreement is signed with an affiliate. *See Env't Def. Fund v. FERC*, 2 F.4th 953, 975 (D.C. Cir. 2021). *Environmental Defense Fund* requires FERC to look beyond the bare precedent agreement in determining project need when there is evidence of self-dealing or other affiliate abuse. *Id.* But that case is distinguishable because it involved an objection to an initial certificate issuance. Sierra Club may not attack the affiliate precedent agreement as invalid evidence of market need in the instant proceeding because that agreement has not changed since the issuance of the certificate order. *See Algonquin Gas*, 170 FERC ¶ 61,144, at P 40 ("The Commission will not consider arguments that re-litigate the issuance of the certificate order . . . .").

at P 32 (noting that 72% of the gas is intended for delivery into Canada, "with the option for delivery along [the pipeline system] in northern and central New York").

We similarly reject Sierra Club's argument that the effects of the Climate Act necessitated a supplemental NEPA analysis. *See* 40 C.F.R. § 1502.9(d)(1). FERC's determination that the Climate Act will not significantly affect market need also indicates that the Act is not a "significant new circumstance[]" under NEPA. *Nat'l Fuel Extension Order*, 179 FERC ¶ 61,226, at P 18. Moreover, FERC and National Fuel have made no changes to the proposed project that would trigger a supplemental NEPA analysis. *See* 40 C.F.R. § 1502.9(d)(1)(ii). The Commission thus permissibly found that the only issue properly before it was the time needed to complete the project. *See Marsh*, 490 U.S. at 377 (requiring courts to "defer to the informed discretion of the responsible federal agencies" in whether to prepare a supplemental environmental impact statement (cleaned up)). FERC's decision to grant National Fuel's request for an extension of time without first conducting a supplemental NEPA analysis was not arbitrary or capricious.

**D.**

FERC also adequately explained its finding of good cause to grant Cheniere an extension. FERC acknowledged that the "adverse economic and logistical impacts of the COVID-19 pandemic prevented [Cheniere] from making a timely investment decision on the project to meet construction deadlines." *Cheniere Extension Order*, 179 FERC ¶ 61,087, at P 10. Petitioners argue, however, that FERC's finding of good cause was insufficiently supported by specific facts about the pandemic's impact on Cheniere's investment decision. At oral argument, Petitioners gave examples of the types of facts that

they believe are required, such as the percentage of investment Cheniere still lacked and how many more contracts it needed to enter.  Oral Argument at 6:50, *Sierra Club v. FERC* (No. 22-1235).

Again, Petitioners advocate for an unduly high level of stringency in determining good cause.  FERC properly exercised its broad discretion to decide what facts were sufficient to meet the "good cause" standard:  It relied on Cheniere's representation that the pandemic's effects on LNG markets prevented it from making a "final investment decision."  As Cheniere explains, a "final investment decision" is an energy-industry term describing the process by which a sponsor secures financing; it requires the project sponsor to "be confident that it will be able to sell a significant percentage of the project's output" at an economically viable price.  Brief of Cheniere, *Sierra Club v. FERC* (No. 22-1235), at 7 (quoting Final Investment Decision (FID) (US), Westlaw Practical Law Glossary Item w-026-2352).  Although FERC's explanation for granting the extension was concise and used industry-specific terminology, the Commission's rationale was discernable and therefore adequate.  *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) ("While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." (cleaned up)).  We therefore uphold FERC's decision to grant Cheniere an extension of time to complete its construction project.

\* \* \*

FERC's decisions to extend the construction deadlines for the National Fuel and Cheniere projects were not arbitrary and capricious.  To the contrary, the decisions were reasonable and

adequately supported by the record evidence. FERC enjoys broad discretion in determining whether a project developer has demonstrated "good cause" for an extension and whether circumstances have changed enough to warrant revisiting the Commission's findings justifying approval of the project. Petitioners' assertions that FERC is required to adopt a more stringent approach to assessing extension requests are unsupported by the NGA and the APA. Accordingly, we deny the petitions for review.

*So ordered.*